## IN THE DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

|  |  |  |
|---|---|---|
| **ANDREA WASHINGTON**<br>378-B Whitewater Drive #6<br>Boilingbrook, Ill. 60440<br><br>Plaintiff,<br><br>v.<br><br>**UNIVERSITY OF MARYLAND –**<br>**EASTERN SHORE**<br>11868 Academic Oval<br>Princess Anne, MD 21853<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |

## TITLE IX COMPLAINT

### I.     PARTIES

1.     Plaintiff Dr. Andrea Washington ("Washington"), is a female resident of Illinois.

2.     Dr. Washington was previously employed at the University of Maryland Eastern Shore, against whom she brings this suit pursuant to Title IX of the Civil Rights Act, alleging a sexually hostile work environment, discriminatory and retaliatory firing.

### II.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.   No administrative remedies need be exhausted under Title IX.

### III.    JURISDICTION & VENUE

4.    Defendant is a university, and part of the University of Maryland system, that operates in Princess Anne, Maryland.

5.    UMES is a "program or activity" and federal funds recipient, as described in 20 U.S.C.§1687, and therefore subject to Title IX.

6.    Dr. Washington has an implied private right of action under Title IX. *Cannon v. University of Chicago*, 441 U.S. 677 (1979).

7.    This Court has subject-matter jurisdiction over this Complaint pursuant to 42 U.S.C. § 2000d-7 and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

8.    The actions protested herein occurred within the state of Maryland.

9.    This court accordingly has jurisdiction over the claims in this Complaint, and venue is proper.

### IV.    FACTS

10.    Dr. Washington began working for Defendant at the UMES campus, in August 2016, as the Director of the Counseling Center.

11.    As such, she reported to the Associate Vice President and Interim Vice President, for the Division of Student Affairs.

12.    At the time of her employment, the Associate Vice President was a Dr. James M. White, Jr.

13.    The Interim Vice President for the Division of Student Affairs was Dr. J. Michael Harpe.

14.    Dr. Harpe initially complimented Dr. Washington's work after she entered on duty.

15.     Dr. Harpe told Dr. Washington she was performing well in interacting with students and students' parents.

16.     At one point, Dr. Harpe even requested that Dr.Washington write a summary for a meeting Harpe was having with the White House.

17.     Dr. Washington was praised for working with the athletic department and increasing Counseling Center clientele.

18.     Beginning toward the end of 2016, at least twice per week, Dr. Harpe would threaten and intimidate Dr. Washington in a directly sexist fashion while simultaneously implying that Washington's worth rested entirely on her ability to perform femininity in way that was satisfactory to him.

19.     Dr. Harpe shouted at Dr. Washington that he was "going to run my staff like the military. My father was in the military. I'm an Alpha male."

20.     He told her that, "[n]o men are going to like you because you are a strong black woman. I'm not intimidated by you like these wimpy men here at UMES because I'm an Alpha male."

21.     He further criticized Dr. Washington that she was "too assertive" and that she needed "to learn how to pivot." Oddly, Dr. Harpe would also yell at Washington to stop talking with her hands.

22.     On at least one occasion, Dr. Harpe compared Dr. Washington to Harriet Tubman after telling her that she was a strong black woman. He seemed to be saying that she was too strong.

23.     Dr. Harpe would say that Dr. Washington was too direct, too aggressive, and that she wasn't worthy of a man. Harpe said to Washington, "You're a strong black woman, I'm an Alpha male. I'm not afraid of you."

24. Dr. Harpe would yell at Dr. Washington that she needed to "show [her] softer side!" and added "[t]hat's why the men here are afraid of you! Women here are mild mannered and do not challenge men with their opinions and thoughts! This is why no men here will ever like you! You will never get a man!" Harpe would continue to assert: "[b]ut because I am an Alpha male, I can handle you."

25. Dr. Harpe told Dr. Washington, "You have the right job, but you're in the wrong place[,]" and would threaten her that "people on the shore don't know how to deal with strong women and you're a strong black woman[.]" adding "women here are more passive than you."

26. These sexist tirades occurred daily.

27. Around November 2016, Dr. Harpe expressed to Dr. Washington his unhappiness with the work of Dr. Joseph, the ADA Coordinator, and asked Washington to take over some of the responsibilities of the ADA Coordinator because Washington had "good people skills." Washington agreed to so add to her existing responsibilities with the benefit of a salary increase.

28. Dr. Harpe told Dr. Washington that she would get a raise after her next PMP.

29. Ultimately, however, Dr. Washington had only one official evaluation during her UMES tenure, and never received the promised salary increase.

30. In February 2017, Dr. Washington began to experience severe panic attacks at work and during the night because she was terrified of seeing Dr. Harpe. Further, she began having panic attacks any time she had to see Harpe.

31. Dr. Washington sought medical help from Dr. Amy Walsh who prescribed Washington Lorazepam and suggested talk therapy.

32. Shortly after Dr. Harpe's harassment began in late 2016, Dr. Washington reported it (sex harassment) to her supervisor, Dr. White.

33.     Dr. White, however, continued the sexism, advising Dr. Washington to use her "softer side" and be "more subservient and docile."

34.     Dr. Washington continued protesting to Dr. White to no avail, and the harassment continued.

35.     In February 2017, Dr. Washington disclosed to Dr. White that Washington began having panic attacks due to the harassment.

36.     Dr. White did nothing (again), even though in his capacity as Vice President of Academic Affairs and as Dr. Washington's direct supervisor, White was a university official with investigative and corrective authority.

37.     After receiving no help from Dr. White, in February 2017, Dr. Washington went to the Title IX Coordinator, Mr. Rudasill, to report Dr. Harpe's sex-based harassment.

38.     Mr. Rudasill, a university official with investigative and corrective authority, failed to investigate or take any action.

39.     Mr. Rudasill told Dr. Washington that if Dr. Harpe found her work performance to be unsatisfactory that Harpe would deem it necessary for Washington to attend management training.

40.     Seeing as Dr. Harpe did not indicate at any point his desire or need for Dr. Washington to attend management training, Dr. Rudasill told Washington, "Don't worry about it."

41.     In late March 2017, Dr. Washington confronted Dr. Harpe, asserting that he was harassing her based on her sex. Harpe laughed it off.

42.     On April 2, 2017, Dr. Washington filed an oral complaint with attorney Marie Billie in HR (who is a university official with investigative and corrective authority), who told

Washington that the complaint "is official and will be typed up in a report and emailed" to Washington later.

43.     The typed complaint was never received by Dr. Washington, however.

44.     Ms. Billie claims she sent the sex discrimination complaint to Title IX Coordinator, Mr. Rudasill.

45.     If this is indeed true, Mr. Rudasill—the Title IX coordinator who is specifically listed as a university official with investigative and corrective authority—had multiple complaints of sex discrimination from Dr. Washington, to which he failed to respond.

46.     Indeed, Dr. Washington had no knowledge of an investigation being conducted until after it was too late and Washington was already terminated.

47.     Dr. Washington was terminated on April 13, 2017 "based on the recommendation of Dr. J. Michael Harpe[,]" less than two weeks after reporting the sex- based harassment to Marie Billie of University's Human Resources Department, and just after she confronted Harpe about it.

## V.      STATEMENT OF CLAIMS

### COUNT I: UNLAWFUL HOSTILE WORK ENVIRONMENT IN THE FORM OF A CONTINUING VIOLATION, BASED ON SEX, IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688

48.     Plaintiff Washington herein incorporates all above-mentioned paragraphs by reference.

49.     The Civil Rights Act, Title IX, forbids infliction of a hostile work environment against an employee on account of sex.

50.     The "offending conduct must be3 (1) unwelcome, (2) based on sex, and (3) sufficiently severe or pervasive to alter the employment conditions and create an abusive work environment.

51.     A workplace may be objectively hostile when harassment is frequent, severe, threatening or humiliating.

52.     A harassment victim is required to make a concerted effort to inform the University. *Barrett v. Applied Radiant Energy Corp.*, 240 F. 3d 262, 268 (4th Cir. 2001), and Dr. Washington did so, by informing numerous University authorities including the Title IX coordinator.

53.     When the employer is "on notice of at least a potential hostile work environment" it must respond. *Howard v. Winter*, 446 F.3d 559, 571 (4th Cir.  2006).

54.     The employer's actions must be sufficient to persuade a "rational juror" as "reasonably calculated to end the harassment."

55.     However, if the employer demonstrates deliberate indifference, liability may attach. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. at 642 (1999)

56.     Here, University policy renders its administrators and faculty as responsible employees who must report any written or oral complaint to the Title IX Coordinator.

57.     Most critically, Dr. Washington protested to the Title IX Coordinator directly after her earlier complaints failed to end the harassment.

58.     The facts described above and others, together show the necessary severe or pervasive hostility to Dr. Washington, and sufficient University failure to end that harassment, to render the University liable for the hostile environment.

59.     By failing to protect Dr. Washington from unwelcome, severe, pervasive sexual harassment while performing work at the University of Maryland- Eastern Shore, Defendant UMES violated Title IX.

**COUNT II:     UNLAWFUL DISCRIMINATORY TERMINATION, IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688**

60.     It is unlawful under Title IX of the Civil Rights Act, for an employer and/or recipient of federal financial assistance, to fire an employee on account of her sex.

61.     Here, Dr. Washington was terminated, but Defendant has never given her a reason, having only stated that it was Dr. Harpe who recommended the firing.

62.     However, as shown infra, Dr. Harpe's whose sexism and bias against Dr. Washington were expressed directly and repeatedly before the firing.

63.     Accordingly, any excuses Defendant might now assert to cover up discrimination and retaliation, did not really motivate the discharge.

64.     By discharging Dr. Washington on account of her sex, Defendant violated Title IX.

**COUNT III:   UNLAWFUL RETALIATORY TERMINATION, IN VIOLATION OF THE EDUCATION AMENDMENTS OF 1972 ("TITLE IX"), 20 U.S.C. §§ 1681-1688**

65.   It is unlawful under Title IX of the Civil Rights Act, for an employer and/or recipient of federal financial assistance, to retaliate against an employee or other person for taking protected actions against it.

66.     Under the U.S. Supreme Court's ruling in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006), a retaliatory action can form the basis of a claim if it would tend to deter employees or others from making a discrimination complaint.

67.      It was just after Dr. Washington's protests regarding Dr. Harpe directly to White, Harpe, Billie and Rudasill-- the Title IX Director, and after Rudasill mischaracterized and dismissed Harpe's sex discrimination as a "personality conflict[,]" that Harpe had Washington fired without any explanation.

68.    Considering Defendant's hostility to Dr. Washington's hostile environment protest and the absence of any non-discriminatory, non-retaliatory justification for Harpe's decision to fire her, it is clear that the firing was unlawfully retaliatory in response to Washington's Title IX-protected activity.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court grant the following relief:

(a)    Review and judicial oversight and management training, for the Defendant's Human Resources and Title IX offices, for the purpose of correcting the blatant failure of those authorities to properly handle discrimination complaints like Dr. Washington's.

(b)    Dr. Washington's reinstatement to the position she would have held absent the discrimination and retaliation from which they suffered, with full back pay and benefits;

(c)    Compensatory damages, in amounts to be determined by the jury in accordance with the proof at trial, for both the pecuniary and emotional harms caused by Defendants;

(d)    Prejudgment and post-judgment interest;

(e)    Reasonable attorneys' fees, expenses and costs;

(f)    Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

(g)    Such other relief as the Court shall deem just and proper.

## VII.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

_____

Leizer Z. Goldsmith
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
Tel: (202) 895-1506
Fax: (202) 318-0798
Attorney for Plaintiff Dr. Andrea Washington