## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANDREA WASHINGTON,

     Plaintiff,

v.

UNIVERSITY OF MARYLAND,
EASTERN SHORE ET AL.,

     Defendants.

Civil No. 19-2788-BAH

## MEMORANDUM OPINION

Plaintiff, Dr. Andrea Washington ("Dr. Washington"), brings the present employment discrimination suit against the University of Maryland Eastern Shore ("UMES")[1] and numerous employees of UMES. ECF 1 (Complaint); ECF 15 (Amended Complaint). The Defendants include Dr. Heidi Anderson ("Dr. Anderson"), Dr. Michael Harpe ("Dr. Harpe"), Marie Harmon Billie ("Ms. Billie"), and Richard Hardy Rudasill ("Mr. Rudasill," and collectively "Defendants"). ECF 15, at 2 ¶¶ 1–6.

Pending before the Court is Defendants' motion for summary judgment (the "Motion"). ECF 78. Dr. Washington filed an opposition, ECF 85, and Defendants filed a reply, ECF 92. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and

---

[1] UMES was terminated as a party on September 24, 2020. *See* ECFs 34, 35 (memorandum granting motion to dismiss all counts against UMES and accompanying order).

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page, except when referring to ECF 78-2 (Washington Deposition), which does not include consistent ECF numeration.

finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).  Accordingly, for the reasons

stated below, Defendants' Motion is **GRANTED**.

## I.   BACKGROUND

The Court recounts the facts in the light most favorable to Dr. Washington. *Anderson v.*

*G.D.C., Inc.*, 281 F.3d 452, 455 (4th Cir. 2002) (citing *Sales v. Grant*, 158 F.3d 768, 775 (4th Cir.

1998).  In 2016, Dr. Washington accepted a position at UMES to serve as the Director of the

Counseling Center.  ECF 78-2 (Washington Deposition), at 19, 51:14–16.  Dr. Washington was

hired on an at-will basis and for a one-year probationary period.  ECF 78-3 (Offer Letter); ECF

78-2, at 20–21, 52:7–53:5 (regarding Dr. Washington's probationary period); *id.* at 20, 52:6–9

(regarding  Dr.  Washington's  at-will  contract).    Dr.  Washington's  responsibilities  included

managing the counseling center and staff, ECF 78-2, at 25, 57:14–17, overseeing grants, *id.* at 29,

64: 3–15, as well as providing counseling, *id.* at 64:6.

At the time of her hiring, Dr. Washington's direct supervisor was Dr. James White.  ECF

78-2, at 32–33, 67:21–68:5.  Dr. White's immediate supervisor and Dr. Washington's second-level

supervisor was Dr. Harpe.  ECF 78-2, at 36, 72:1–14.  Dr. Harpe was UMES's Interim Vice

President of Student Affairs.  ECF 78-8 (Letter from President Bell).  Dr. Harpe reported directly

to Dr. Juliette Bell, who was serving at that time as the President of the University.  ECF 78-9

(Harpe Deposition), at 9, 21:3–5; ECF 78-5 (Bell Deposition), at 4, 3:15–21.

From August 2016 to February 2017, Dr. Washington saw Dr. White on a weekly basis

and Dr. Washington saw Dr. Harpe "about twice a month."  ECF 85-1 (Washington Declaration),

at 2 ¶ 12; ECF 78-2, at 33, 68:12–19.  On February 26, 2017, Dr. White was hospitalized and

subsequently took medical leave and later retired.  ECF 85-1, at 7–8 ¶¶ 81–85.  This resulted in

Dr. Washington having more frequent interactions with Dr. Harpe.  *Id.* at 8 ¶ 84; ECF 78-2, at 38,

74:6–10.

2

Dr. Harpe made the decision to recommend Dr. Washington's termination in "late February[,][e]nd of March," 2017. ECF 85-1, at 8 ¶ 88; ECF 78-9, at 96–97, 200:21–201:3. On March 1, 2017, Dr. Harpe wrote to the Vice President for Administrative Affairs, Kevin Appleton, seeking approval to terminate Dr. Washington's employment. ECF 78-29 (requesting separation from employment); ECF 78-9, at 76–77, 153:16–154:14. On March 16, 2017, Dr. Harpe sought approval from President Bell, ECF 78-32, and on March 17, 2017, Dr. Harpe sent a letter with justifications supporting the employment action, *id.* at 5. The justifications included that there had been "numerous reports of being unapproachable, abrasive, confrontational[,] and unethical[,]" "questionable management practices . . . e.g., crossing professional and ethical boundaries . . . excessive absenteeism and/or tardiness to work[,]" "reports of being overly intrusive, unprofessional, dismissive, unethical in her duties as a counselor[,]" and "lack of oversight and management of the Title III reports that are due quarterly and the lack of management and oversight as the Principal Investigator for the Morehouse Grant[.]"[3] ECF 78-30. Dr. Bell approved the termination. ECF 78-31 (responding on March 17, 2017, "Thank you" and replying against on April 5, 2017, saying "I wasn't clear on the email below. I approve the requested action").

Ms. Billie, the head of UMES' Human Resources Department, ECF 78-6 (Billie Deposition), at 6, 5:6–16, and Mr. Rudasill, UMES' Title IX coordinator, ECF 78-7 (Rudasill Deposition), at 6, 5:1–3, were not involved in the decision to terminate Dr. Washington's employment. ECF 78-6, at 27, 58:9–11; ECF 78-7, at 62–64, 87:15–89:17. On April 13, 2017,

---

[3] Title III grants are "government funds" to "run programs in universities." ECF 78-2, 65:10–14. As relevant in this case, the Title III funding supported the counseling center. *Id.*; *see* ECF 78-22, at 3. The "Morehouse Grant" refers to $7,500 UMES received from the Morehouse School of Medicine. Univ. of Md. E. Shore, 2016-2017 Institutional Program of Cultural Diversity Annual Progress Report, 10 (Apr. 3, 2017), https://www.usmd.edu/BORPortal/Materials/2017/EP/20170516/ps_2b2_UMES.pdf (describing a "Mini-grant" UMES received from the Morehouse School of Medicine to "support special interests such as LGBTQ").

Dr. Washington received her formal termination notice. ECF 78-42. Additionally, Ms. Billie, Mr. Rudasill, and Dr. Harpe are no longer currently employed by UMES. ECF 78-6, at 5, 4:2–9; ECF 78-7, at 9–11, 29:14–31:7; ECF 78-45 (Harpe Resignation letter).

### A.    Dr. Washington's Discrimination Allegations

On April 3, 2017, Dr. Washington initiated a formal oral complaint with Ms. Billie. ECF 85-1, at 8 ¶ 92. Dr. Washington alleges that she was subject to sexual harassment beginning about one month into her employment when Dr. Harpe compared Dr. Washington to Harriet Tubman. ECF 78-2, at 199:3–8. Dr. Washington interpreted this as harassment because she thought it actually meant he was saying she was too "strong," and that "no man is going to ever want [her] because of [her] strength." *Id.* 199:9–20. The harassment would allegedly occur in Dr. Harpe's office when they were alone and occurred on approximately 10–20 occasions during the seven months of her employment (August 2016 to March 2017). ECF 85-1, at 2–3 ¶¶ 11, 24.

Dr. Washington describes the harassing behavior as Dr. Harpe making comments that were "an attempt to eventually get [Dr. Washington] to have sex with [Dr. Harpe]." *Id.* at 3 ¶ 28. Dr. Washington describes, for instance, certain "backhanded compliment[s]" such as calling her a "strong black woman" but saying "no man would ever want [her] because of that." *Id.* at 4 ¶ 35. Similarly, Dr. Washington interpreted the comparison to Harriet Tubman as another backhanded compliment. *Id.* ¶ 38.

Dr. Washington also suggests that Dr. Harpe attempted to lower her self-esteem with criticisms that Dr. Washington contends mirror those of "an aspiring pickup artist." *Id.* at 3 ¶¶ 29– 32 (suggesting Dr. Harpe's behavior was similar to tactics from a book entitled *"The Game: Penetrating the Society of Pickup Artists"*). These criticisms included that she should not "talk with [her] hands," *id.* at 4 ¶ 39, because it was not "ladylike," ECF 78-2, at 77:16–17. Dr. Harpe told Dr. Washington she "had the right job, but was in the wrong place," and sometimes would tell

4

her "to be more assertive, and at the same time, less assertive." ECF 85-1, at 4 ¶¶ 39–41. He also

would tell her she needed to "learn how to pivot" and "show [her] softer side," ECF 78-2, at 80–

81, 128:22–129:1, and would yell at Dr. Washington over the phone, ECF 78-47, at 10.

Additionally, Dr. Washington alleges Dr. Harpe would tell her she "needed a man like

him" and that Dr. Harpe knew how to "handle" her. ECF 85-1, at 5 ¶ 44. Dr. Harpe allegedly

commented on Dr. Washington's physical appearance as well by saying she "looked nice." *Id.* ¶

53. As a result of these comments, Dr. Washington felt "fearful" and experienced panic attacks.

*Id.* ¶ 56.

Dr. Harpe also would allegedly tell Dr. Washington that people are "watching [her] and

. . . [she] needed him," ECF 78-2, at 140, 208:4–7, and that "[o]nly a man like him would be able

to understand [her] and handle a woman like [her]." *Id.* Dr. Harpe would allegedly refer to himself

as an "Alpha Male," ECF 85-1, at 7 ¶ 77, which Dr. Washington interpreted to be an attempt by

Dr. Harpe to paint himself as superior to the other men they worked with. *Id.* These comments

"added to [Dr. Washington's] anxiety, panic attacks, and need for therapy and medication." *Id.* ¶

78.

Dr. Washington alleges that she told Dr. Harpe twice that she felt harassed by him, once in

January and once in February 2017, ECF 78-2, at 145, 213:9–18, and Dr. Washington alleges Dr.

Harpe laughed at her in response, *id.* at 146, 214:4–5. In February 2017, Dr. Washington alleges

she spoke with Ms. Billie about Dr. Harpe's behavior.[4] ECF 78-47, at 14. Then, on February 28,

---

[4] Additionally, on February 27, 2017, Dr. Washington alleges she emailed Dr. Harpe about his
failure to approve her attendance at a conference. ECF 85, at 12. Dr. Washington asserts that in
the last sentence of this email she "directly accused Harpe of [] sex/gender discrimination," *id.*,
though Dr. Washington does not provide this email and the Court cannot locate it in the record.
*See id.* (citing to "White Exhibit 51," presumably referring to an Exhibit in Dr. White's deposition,
though the email is not attached to Dr. White's deposition, *see generally* ECF 85-8; ECF 78-19);
*see also* ECF 85, at 6 n.1 (including a description of Dr. Washington's "record reference system"

2017, Dr. Washington alleges that she met with Mr. Rudasill about Dr. Harpe. ECF 78-2, at

112:12–113:5. Mr. Rudasill testifies that Dr. Washington did not make any formal allegations in

this meeting, ECF 78-7, at 71–72, 97:3–98:9, as he understood it to be "a venting session." ECF

78-7, at 25, 50:21. In turn, Dr. Washington accuses Dr. Rudasill of "suppress[ing] the complaint."

ECF 85, at 12.

Finally, Dr. Washington alleges that Dr. Harpe was eventually terminated in 2018 for

sexually harassing other individuals, *see* ECF 85, at 20; ECF 85-4, at 12,[5] though UMES did not

disclose the specific findings of the investigation.[6] *See id.*

### · B.    Defendants' Allegations of Work Complaints Regarding Dr. Washington

Defendants provide evidence of numerous work deficiencies and professionalism

complaints that they contend justified Dr. Washington's termination. *See* ECF 78-30. Dr.

Washington does not appear to dispute that certain workplace incidents occurred, rather Dr.

Washington essentially argues that the timing of the complaints related to these incidents cannot

support the reasonable inference that the complaints were the reason for her termination. *See* ECF

85, at 46.

---

for the brief). The record does, however, reflect that on March 1, 2018, Dr. Washington sent Dr. Harpe a strongly worded email with the subject "Title III threats," which related to a conflict between Dr. Washington and the Title III coordinator (not Dr. Harpe). *See* ECF 78-24.

[5] Dr. Washington provides a document showing Dr. Harpe was terminated for violating UMES' policy against sexual discrimination on November 7, 2018. ECF 85-4, at 12. The exhibit provided is incomplete, as Defendants were unable to procure more than the first page of the letter. *See* ECF 85-3, at 36–37. Defendants note that Dr. Harpe was given the option to resign or be terminated after an independent investigation was conducted by Miles & Stockbridge, and that Dr. Harpe chose to resign. ECF 78-46, at 13.

[6] Dr. Washington asks the Court to consider this evidence of "other bad acts" pursuant to Federal Rule of Evidence 404(b). *See* ECF 85, at 49–50. However, the Court need not decide whether such evidence is admissible, because as will be explained *infra*, Section III.C.2, the Court does not reach the question of pretext, where an examination of an individual's intent and motivations may be especially relevant.

Within the first month of her employment, Dr. Harpe received a complaint about Dr. Washington from a student who reported feeling uncomfortable around Dr. Washington, due to Dr. Washington's reaction to the student's past sexual assault. *See* ECF 78-9, at 82, 180:13–15 (receiving the complaint on September 22, 2016); ECF 78-10 (including the September 2016 student complaint), at 2. The student wrote:

> The first time I met Dr. Washington on September 21, 2016, I felt uncomfortable after speaking to her. When I was giving her a basic back story on my life, she focused on the time I was raped and started asking too many personal questions. I told her that wasn't the reason I was there. She then brought my boyfriend into the room to sit with me, and brought it up to him asking him questions about it, which could have been really bad if he didn't know about it prior. I feel like I can't trust her fully now because of that.

*Id.* Shortly thereafter, in October 2016, Dr. Harpe received three more complaints about Dr. Washington's interactions with staff members and students.

The first of these complaints stemmed from an incident occurring on October 6, 2016. ECF 78-6, at 60, 145:4–8; ECF 78-11, at 3. Ms. Billie relayed an incident that occurred between Dr. Washington and Whitney Gerst, one of the counselors who was working on an interim basis at the counseling center who had just received notice she was not selected for permanent employment. ECF 78-6, at 60, 145:4–8, at 62, 147:11–20. Ms. Gerst was given notice on Wednesday October 5th, but was allowed to stay until Friday October 7th to clear out her office, ECF 78-11, at 3–5. On October 6th, Dr. Washington insisted that Ms. Gerst leave immediately. *Id.*; ECF 78-6, at 62, 147:19–20. In a summary of the incident to Dr. Harpe, Ms. Billie wrote:

> I write this memo at your request and to express my concerns about Dr. Washington's behavior in this circumstance. It was most unbecoming of a health care professional. She showed a marked lack of concern for the feelings of an employee who was losing her job. She showed a lack of concern for M[]s. Gerst as a pregnant woman and therefore in a somewhat fragile state. She also yelled to the point that I could hear her outside her office and her office has been relocated by her to the center of the office adjacent to the waiting area. Had students been in the office, they would have heard her yelling in a very unprofessional way. In sum,

7

I believe her behavior was unprofessional and totally lacking in the decorum and empathy that I would expect from a person in the counseling profession.

ECF 78-11, at 5 (emphasis in original).

Dr. Washington testified in her deposition that she wanted Ms. Gerst removed immediately because "Ms. Gerst was just insulting and belligerent and always nasty and rude, and I was just tired of her." ECF 78-2, at 84, 132:8–14. Dr. Washington did not deny yelling, and instead explained that "when [she] get[s] excited, [her] voice escalates." *Id.* 132:15–17. Additionally, Dr. Washington testified she was concerned that Ms. Gerst would "try[] to sabotage any of the work that [the counseling center] had done, going through the computers and sabotage any of the client files or anything else." *Id.* 132:11–14.

Dr. Harpe received another complaint about Dr. Washington two weeks after the incident with Ms. Gerst. ECF 78-1, at 7. On October 19, 2016, the University's Interim Director of the Office of Campus Life, Cecilia Rivera, complained to Dr. Harpe that she observed Dr. Washington "rudely dismiss a student in need of assistance." *Id.*; *see also* ECF 78-12 ("This is not the first time I have felt this way about Dr. Washington when it comes to victims of sexual assault.").[7]

On October 20, 2016, Dr. Harpe received another complaint about Dr. Washington's behavior—this time from a member of the IT staff, Eric Williams. ECF 78-13, at 2. Mr. Williams summarized an incident that occurred on October 20, 2016, in a letter to Dr. Harpe. *Id.* Mr.

---

[7] For instance, Ms. Riviera complained to Dr. Harpe that:

> Earlier this semester when I dealt with a student who was inappropriately touched by a staff member, I emailed Dr. Washington to let her know a student would be coming to the counseling center to see someone. Dr. Washington reached out to me for specific information about the student and when I told her the nature of the assault, she asked me if the touching was intentional. That question is irrelevant. If I told her the student was victimized, she should be able to take my word for it as the advocate.

ECF 78-12, at 2.

Williams wrote that Dr. Washington called the IT helpdesk due to her laptop's deficient battery. *Id.* Mr. Williams indicated that Dr. Washington repeatedly requested to speak to supervisors and refused to bring her laptop to Waters Hall to permit IT to examine it. *Id.* The laptop was eventually brought in for an examination, but Mr. Williams communicated to Dr. Harpe that "Dr. Washington was extremely pushy and unprofessional." *Id.* (ending his note with a request that Dr Harpe "address this situation so it is not repeated in case there may [be] future helpdesk needs").

On November 7, 2016, Ms. Billie forwarded to Dr. Harpe another complaint from a student B.W.,[8] who was the leader of the students' LGBTQ group, Uniquely Defined. ECF 78-14, at 2–13; ECF 78-7, at 84, 124:3–20; ECF 78-9, at 96, 200:4–13. In his complaint, B.W. recounted at length several exchanges with Dr. Washington, in which Dr. Washington allegedly publicly shamed the student and threatened to sue the student. ECF 78-14 (including an email chain between B.W. and Ms. Billie, thereafter, forwarded to Dr. Harpe on November 7, 2016), at 3–13. The conflict began after Dr. Washington led the selection of a "Campus Ambassador" for a GLAAD program and B.W., as well as others, raised concerns about there being equal opportunities for the position.[9] *Id.* at 5.

After another dispute arose between B.W. and Dr. Washington, Dr. Harpe convened a meeting on December 1, 2016, with Dr. Washington, B.W., Ms. Billie, and Mr. Rudasill. ECF 78-2, at 92–93, 140:15–141:12; ECF 78-9, at 91–93, 191:17–193:7. Dr. Washington allegedly called B.W. a liar, and acted confrontationally, ECF 78-6, at 59–62, 144:18–147:6; ECF 78-7, at 81–83, 121:6–16; 123:16, which prompted Ms. Billie to email Dr. Harpe stating:

---

[8] Defendants identify this student only by initials for purposes of complying with the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA"). *See* ECF 78-1, at 7 n.2.

[9] "GLAAD is a non-profit organization focused on LGBTQ advocacy and cultural change." *About GLADD*, GLADD, https://glaad.org/about/ (last visited July 7, 2024).

> I am not sure what decision you have made regarding Dr. Washington but,
> for the record, I want you to know that I found her behavior and interaction with
> B.W. highly inappropriate, provocative, and counter-productive. I have never seen
> an employee attack a student in this manner. This was highly inappropriate
> behavior especially for someone in the "helping" profession.

ECF 78-15; *see also* ECF 78-16 (detailing email communication on December 1, 2016, from Dr.

Washington to Dr. Harpe saying she felt "blindsided" by the presence of two UMES attorneys at

the meeting and that she felt she was "on trial" and "might need to lawyer up"); ECF 78-17

(including email communication on December 12, 2016, from Ms. Billie to Dr. Washington stating

"I could not sit quietly when I felt you were speaking to or about the student in an abusive and

disrespectful way. I was very disappointed that you called [B.W.] a 'liar' several times and used

other personally abusive and disrespectful language when [B.W.] was very respectful to you").

In addition to these interpersonal complaints, Dr. Harpe alleges there were issues with Dr.

Washington's handling of administrative tasks. Specifically, Dr. Washington was responsible for

overseeing two grants for UMES: the Title III grant and the Morehouse Grant. ECF 78-9, at 31–

32, 66:16–67:20; *see also supra* note 3 (describing the grants). Dr. Harpe received reports from

staff members that Dr. Washington failed to submit the quarterly reports to the Title III Coordinator

in a timely fashion, which jeopardized the funding of the Counseling Center. *See* ECF 78-21, at 2

(attaching an email sent February 27, 2017, from the Title III Coordinator to Dr. Washington, with

Dr. Harpe carbon copied, indicating the quarterly report is past due and must be provided within

one week); ECF 78-22, at 3 (attaching an email sent February 28, 2017, from the Title III

Coordinator indicating "[I]t is a privilege and honor to receive Title III funds and not an

entitlement. Therefore, if your office is unable to abide by Title III Program rules and guidelines,

it will be my recommendation that your activity be terminated by the end of September 2017").

This email communication apparently prompted Dr. Washington to call the Title III office

"gangsters," in a separate email to Dr. Harpe. *See* ECF 78-24 ("Why am I being yelled at and

threatened for someone one else's mistake? What happen to RESPECT! I do not take kindly to

bullying or threats of intimidation. Why are certain people her are allowed to at act like gangsters

and its okay? It is not necessary or professional. If she takes away Title III then UMES will not

have a counseling program. I have no control over that . . . ." (all sic in original) (emphasis in

original)); *see also* ECF 78-25 (emailing Dr. Harpe approximately two hours later indicating a

resolution to the conflict).

While the Title III mid-year report was eventually completed by March 3, 2017, Dr. Harpe

received information that Ms. Kathy Kent, one of the counselors in the Counseling Center had

completed the report instead of Dr. Washington. *Compare* ECF 78-27, at 2 (attaching email

communication from Dr. Washington to Dr. Harpe on March 2, 2017, indicating "I have completed

the midyear report. Deborah will complete the formatting and it will be on Dr. McKinney's desk

by end of day tomorrow. Now that I am familiar with the process I can do this as I go along. This

way all of my information will be in one place") *with* ECF 78-28, at 2 (attaching email

communication from Ms. Kathy Kent to Dr. Harpe on March 1, 2017, indicating "Dr. Washington

has asked me to help her with her report. She ended up giving all her materials to me for mid-term

report and having me write it. Not sure what she's up to today").

Regarding the administration of the Morehouse Grant, Dr. Harpe also observed that Dr.

Washington did not understand her role as the Principal Investigator, and instead was seeking to

have the grant writer, Sylvia Quinton, administer the grant. *See* ECF 78-23, at 2–6. In an email

chain on February 14, 2017, between Dr. Washington and Ms. Quinton, with Dr. Harpe carbon

copied, Dr. Washington asked Ms. Quinton to explain "why [she] ha[s] decided to no longer be

part of this process after all of this **length of time?** And why ha[s] [she] decided to stop being part of the decision making process and implementation of the monies?" *Id.* at 3 (emphasis in original). This caused Dr. Harpe to intervene and tell Dr. Washington "You are the Principal Investigator (PI) for this grant. Ms. Quinton is not supposed to do the programming, just develop the proposal. She is willing to assist, but not to take the lead—you are responsible for this initiative." *Id.* at 2.

Finally, Dr. Harpe had also received complaints about Dr. Washington's absenteeism and failure to provide adequate staffing and coverage for the Counseling Center. *See* ECF 78-9, at 64–66, 139:3–141:18. Dr. Harpe further testified Dr. Washington's writing skills were "not up to standard." *Id.* at 56, 128:11–12; *id.* at 57, 129:7–13 (noting her Title III reports were "ill-prepared. . . . they were full of grammatical errors. It was just not appropriately done. So several times [Dr. Harpe] had to re-do what was done by Dr. Washington because [he] was under time constraints").

### C.   Procedural History

Dr. Washington filed her original complaint on September 20, 2019, over two years after the events giving rise to this action. *See generally* ECF 1 (describing events that occurred in 2016 and 2017). Dr. Washington filed an amended complaint on November 19, 2019, ECF 10, and a corrected amended complaint on December 2, 2019, ECF 15 (Operative Complaint). In light of time having expired to file any claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., Dr. Washington's suit raises claims of a hostile work environment, discriminatory termination, and retaliatory termination under Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX") and the Equal Protection Clause pursuant to 42 U.S.C. § 1983. ECF 15, at 11–20; *see also* ECF 34, at 1 n.2.

Specifically, Dr. Washington alleged a sexually hostile work environment in violation of Title IX, against UMES, ECF 15, at 11–13, and alleged discriminatory termination and retaliatory

termination claims pursuant to Title IX against UMES, *id.* at 15–16. Dr. Washington also alleged Dr. Anderson, Dr. Harpe, Ms. Billie, and Mr. Rudasill violated Dr. Washington's rights under the Equal Protection clause pursuant to 42 U.S.C. § 1983 ("§ 1983") by creating a sexually hostile work environment, *id.* at 13–15, and Dr. Washington further alleges that Dr. Harpe, Ms. Billie, and Dr. Anderson violated Dr. Washington's rights under the Equal Protection clause based on theories of discriminatory termination and retaliatory termination claims pursuant to the Equal Protection clause. *Id.* at 16–20.

Defendant UMES filed a motion to dismiss. ECF 17. The Court ruled on UMES' motion to dismiss on September 24, 2020, dismissing Counts I, IV, and VII of the amended complaint with prejudice, and subsequently UMES was dismissed as a party. *See* ECF 34 (and accompanying order granting motion at ECF 35). Counts II, III, V, VI, VIII, and IX remained. *See id.*

Discovery commenced and was extended numerous times by consent motion. *See* ECFs 62, 64, 66, 68, 70. On October 23, 2023, this case was transferred to the undersigned. On January 16, 2024, Defendants filed to present motion for summary judgment. ECF 78. As of May 3, 2024, the motion is fully briefed and ripe for disposition. *See generally* ECF 92 (Defendants Reply).

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging*

13

*Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court cannot weigh evidence, *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (citing *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659–60 (4th Cir. 2018)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 603 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III.   ANALYSIS

The remaining counts all allege violations of the Equal Protection Clause pursuant to § 1983 based on three theories of liability: hostile work environment (Counts II, and III),

14

discriminatory termination (Counts V and VI), and retaliatory termination (Counts VIII and IX). *See* ECF 15, at 13–20. Defendants argue that: (1) the retaliatory termination claims are not cognizable; (2) many of Dr. Washington's claims are barred by the Eleventh Amendment; (3) the discriminatory termination claims fail on their merits because Dr. Washington fails to establish she was meeting the reasonable expectations of her employer; and (4) that the hostile work environment claims fail because Dr. Washington cannot establish that the harassment she experienced—assuming it is true—was sufficiently "severe or pervasive." *See* ECF 78-1, at 19–39. For the reasons explained below, summary judgment is granted.

### A.    Pure Retaliatory Termination Claims are Not Cognizable as Equal Protection Claims.

In Counts VIII and IX of the Amended Complaint, Dr. Washington asserts claims of "unlawful retaliatory termination, in violation of the Equal Protection Clause, pursuant to 42 U.S.C. § 1983." ECF 15, at 19.

"Neither [the Fourth Circuit] nor the Supreme Court has recognized an equal protection right to be free from retaliation." *Wilcox v. Lyons*, 970 F.3d 452, 458 (4th Cir. 2020); *see also* U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."). Normally, retaliation claims are construed, instead, as implicating the First Amendment because it is the speech that motivates the retaliation—not the protected characteristics of the person who is retaliated against for speaking. *Wilcox*, 970 F.3d at 458; *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999) ("[A] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause."); *see also Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017); *Kirby v. Elizabeth City*, 388 F.3d 440, 447 (4th Cir. 2004); *Beardsley v. Webb*, 30 F.3d 524, 530 (4th Cir. 1994) (noting that "when an employee experiences an adverse employment action after "voic[ing] a grievance" to her public employer, "[a] violation of the First

Amendment's protection of the right to speak out is a necessary predicate to a claim of pure retaliation" (citation omitted)).

In *Wilcox*, a plaintiff asserted that because the plaintiff was allegedly retaliated against for complaining about sexual discrimination specifically, the equal protection right to be free of sexual discrimination came into play. *Wilcox*, 970 F.3d at 459. The Fourth Circuit joined six other circuits in rejecting that argument and held that a retaliation claim, "even if premised on complaints of sex discrimination, is not cognizable under the Equal Protection Clause." *Id.* at 461. Defendants argue that *Wilcox* is directly applicable, and Defendants are entitled to summary judgment on Counts VIII and IX. ECF 78-1, at 22.

Dr. Washington argues that *Wilcox*'s holding is limited to "pure" retaliation claims, *see* ECF 85, at 38–39, though Dr. Washington never actually asserts that this case is distinguishable as a case of "non-pure" retaliation. *See id.* Pulling these concepts apart does not, in fact, assist Dr. Washington's claim. Pure and non-pure retaliation claims differ in relation to what is motivating the discriminatory treatment. *See Wilcox*, 970 F.3d at 460 (comparing pure and non-pure retaliation claims). For example, a pure retaliation claim may involve an individual retaliating against someone for objecting to sexually discriminatory behavior. *See id.* (featuring a plaintiff exemplifying this situation). The gender of the person objecting to the sexually discriminatory behavior is not what motivates the retaliation—it is their objection. *Id.* ("The sex of the complainant is irrelevant, because it is not the complainant's sex that motivated the employer's retaliatory adverse action."); *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) ("[A]ll anti-retaliation provisions . . . provide[ ] protections not because of who people are, but because of what they do."). Thus, as *Wilcox* holds, "[a] retaliation claim of this type []

does not implicate disparate treatment on the basis of a classification forbidden by the Equal Protection Clause." *Wilcox*, 970 F.3d at 460.

By contrast, a non-pure retaliation claim may involve retaliation being used as evidence of sex-based discrimination. *See id.* (providing an example of when "retaliation can . . . be evidence of sex discrimination"). For example, evidence that women who complain of discrimination are retaliated against in an employment setting, along with evidence that men who complain of discrimination are not retaliated against in the same employment setting, may serve as evidence supporting an Equal Protection Claim. *See id.* In such a case, the essence of what is motivating the adverse treatment is the complainant's sex—not their speech. *See id.*

In this case, Dr. Washington alleges that she was retaliated against for complaining about sexual discrimination she faced. *See* ECF 15, at 19 ¶ 149 ("[I]t is clear that the firing was unlawfully retaliatory in response to Washington's 14th Amendment-protected activity."); *id.* ¶ 148 (arguing a plaintiff may bring a claim under the Equal Protection clause when a supervisor "retaliates against him for opposing discrimination in the terms of [her] employment" (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015))). This is a straightforward pure retaliation claim that is not cognizable in the Fourth Circuit under the Fourteenth Amendment. *Edwards*, 178 F.3d at 250 ("[A] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause."). Dr. Washington identifies no genuine distinction between this case and *Wilcox*. *See* ECF 85, at 38–39. Accordingly, Counts VIII and IX are dismissed with prejudice.

### B.     All Official Capacity Claims are Dismissed.

Defendants argue that all remaining official capacity claims against Dr. Anderson (Counts II and V) and against Ms. Billie and Dr. Harpe (Count VI) are barred by the Eleventh Amendment. ECF 78-1, at 19. Dr. Washington counters that these claims are not barred because they fit within

the *Ex Parte Young* exception to sovereign immunity. ECF 85, at 51–55. In assessing this dispute, it is the Defendants' burden to demonstrate that they are entitled to sovereign immunity because it is "akin to an affirmative defense." *MediGrow, LLC v. Natalie M. LaPrade Med. Cannabis Comm'n*, 487 F. Supp. 3d 364, 373 (D. Md. 2020) (quoting *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

By way of background, the Eleventh Amendment to the United States Constitution provides in pertinent part "that '[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State.'" *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019) (quoting U.S. Const. amend. XI)). The Eleventh Amendment preserves a federal balance and confirms the constitutional design in which each state remains a sovereign entity generally immune from suit." *Litman v. George Mason Univ.*, 186 F.3d 544, 549 (4th Cir. 1999).

"[T]he Supreme Court has 'construe[d] the Amendment to establish that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.'" *Pense*, 926 F.3d at 100 (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990)). While by its express terms, the Eleventh Amendment bars federal actions against "any one of the United States," it is well established that additionally, "[t]he Eleventh Amendment bars [] suit against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (citation and internal quotation marks omitted). Accordingly, Eleventh Amendment immunity extends to state officers sued in their official capacities. *Id.* at 101–02; *Pense*, 926 F.3d at 100; *Palotai v. Univ. of Md. Coll. Park*, 959 F. Supp. 714, 716 (D. Md. 1997). In Maryland, "constituent institutions" of higher learning are considered instrumentalities of the state which fall under Eleventh Amendment

immunity. *MedSense, LLC v. Univ. Sys. of Md.*, 420 F. Supp. 3d 382, 391 (D. Md. 2019). UMES is designated by Maryland as a "constituent institution." Md. Code Ann., Educ. § 12-101(b)(6)(iii). With regards to employees, the Fourth Circuit has ruled "that a suit against the state official acting in their official capacities is a suit against the State." *MedSense*, 420 F. Supp. 3d at 396 (internal citation and quotation marks omitted) (citing *Weller v. Dep't of Soc. Servs. for Balt.*, 901 F.2d 387, 397–98 (4th Cir. 1990).

However, "[t]he Eleventh Amendment bar to suit is not absolute." *Pense*, 926 F.3d at 101 (quoting *Feeney*, 495 U.S. at 304). There are three well-recognized exceptions to Eleventh Amendment immunity. First, a state may waive its Eleventh Amendment immunity. *Coll. Savs. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Pense*, 926 F.3d at 101 (citing *Lapides*, 535 U.S. at 618); *Palotai*, 959 F. Supp. at 718. Second, Congress may abrogate the sovereign immunity of the States by acting pursuant to a grant of constitutional authority. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000); *Palotai*, 959 F. Supp. at 716. Third and finally, as is relevant here, under the *Ex parte Young* doctrine, the Eleventh Amendment does not bar private citizens from suing state officials in their official capacity for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law. *See Pennhurst*, 465 U.S. at 101; *see also Borkowski v. Baltimore County*, 414 F. Supp. 3d 788, 804 (D. Md. 2019) ("[I]mmunity does not bar a suit against a state official when a plaintiff is seeking prospective relief to end a continuing violation." (citing *Ex Parte Young*, 209 U.S. at 155–56). Dr. Washington asserts only that her claims fit within the third exception to sovereign immunity. ECF 85, at 51–55.

1. Count II is Barred by the Eleventh Amendment.

First, in Count II Dr. Washington alleges a hostile work environment against Dr. Anderson. ECF 15, at 13. Despite using the word "continuing violation," in the complaint, Dr. Washington only discusses past actions of Dr. Harpe, Ms. Billie, and Mr. Rudasill—all of whom are no longer employees of UMES. *See supra* Section I; ECF 15, at 13 ¶¶ 104–106; *id.* at 16–17. Dr. Washington makes no claims to establish that a hostile work environment is ongoing. *See generally* ECF 15, at 16–17; *see also Singh v. Univ. of N.C. at Chapel Hill*, 659 F. Supp. 3d 659, 678 (M.D.N.C. 2023) ("The plaintiff bears the burden to establish an ongoing violation of federal law to qualify for relief under *Ex parte Young*." (citation and internal quotation marks omitted)), *appeal dismissed sub nom.*, *Singh v. Univ. of N.C. Health Care Sys.*, No. 23-1350, 2023 WL 6374188 (4th Cir. June 20, 2023).

The *Ex parte Young* exception does not apply where the alleged violation of federal law occurred entirely in the past. *See Adler v. Va. Commonwealth Univ.*, 259 F. Supp. 3d 395, 408 (E.D. Va. 2017) (citing *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999)); *see also Leonard v. Towson Univ.*, Civ. No. GLR-21-1464, 2022 WL 3867949, at *7 (D. Md. Aug. 30, 2022) (finding the *Ex parte Young* exception did not apply to former employee's hostile work environment claim against his former supervisors as the plaintiff "could not plausibly allege the presence of an ongoing hostile work environment in a place he no longer works" (internal citation and quotation marks omitted)). The logic in *Leonard* applies with equal force here as Dr. Washington cannot plausibly allege an ongoing hostile work environment, when neither she nor any of the alleged harassers continue to work at UMES. *See* 2022 WL 3867949, at *7. As such, Count II is dismissed.

2.      Count VI is barred by the Eleventh Amendment.

In her Opposition, Dr. Washington does not address Defendants' argument regarding Count VI against Dr. Harpe and Ms. Billie. *See* ECF 85, at 51–55. A plaintiff's failure to address a defendant's arguments in opposition to defendant's dispositive motion may constitute an abandonment of plaintiff's claims. *See, e.g., Ferdinand-Davenport v. Child.'s Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010); *see also Mentch v. E. Savs. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) ("[P]laintiff abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief."). Given the lack of response, the Court finds Dr. Washington has waived opposition to dismissal of this claim, and Defendants' motion to dismiss Count VI against Ms. Billie and Dr. Harpe in their official capacities is granted.

3.      Counts V may fall within the *Ex Parte Young* exception, but still fails on Summary Judgment.

Next, in Count V, Dr. Washington alleges discriminatory and retaliatory termination against Dr. Anderson and seeks injunctive relief. *See* ECF 15, at 16 ¶ 131; *id.* at 19 ¶ 150. Specifically, Dr. Washington requests: (1) "Review and judicial oversight and management training, for the Defendant's Human Resources and Title IX offices, for the purpose of correcting the [] failure of those authorities to properly handle discrimination complaints like Dr. Washington's"; (2) "Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation"; and (3) "Dr. Washington's reinstatement to the position she would have held absent the discrimination and retaliation from which they suffered, with full back pay and benefits." *Id.* at 20–21. Additionally, Dr. Washington raises a few additional forms of relief in a declaration attached to her Opposition. *See* ECF 85-1, at 11 ¶ 116

(requesting Dr. Washington's employment record be cleansed); *id.* at 10 ¶ 114 (seeking front pay); *see also* ECF 15, at 21 (requesting attorney's fees).

### i.   Reinstatement

Dr. Washington accurately notes that "[r]einstatement is a form of prospective relief, [and] the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the *Ex Parte Young* exception applies." ECF 85, at 52 (quoting *Bland v. Roberts*, 730 F.3d 368, 390 (4th Cir. 2013), *as amended* (Sept. 23, 2013)); *see also R. W. v. Columbia Basin Coll.*, 77 F.4th 1214, 1226 (9th Cir. 2023) ("[R]einstatement is a form of prospective injunctive relief."); *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 322 (5th Cir. 2008) (noting "this circuit has always treated *Ex parte Young* as an appropriate vehicle for pursuing reinstatement to a previous job position," that "almost every circuit court has reached the same result," and collecting cases). Indeed, "[e]very circuit, including [the Fourth Circuit], has held that claims for reinstatement to previous employment meet the *Ex Parte Young* exception." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 243 (4th Cir. 2020).

Defendants acknowledge that claims for reinstatement ordinarily fit within the *Ex Parte Young* exception. ECF 92, at 7. Nevertheless, Defendants argue that, in this case, "Dr. Washington abandoned her claim for reinstatement by testifying unequivocally under oath that she had no interest in returning to the University's employ." *Id.* at 7–8 (citing ECF 78-2, at 51, 87:14–20 in which Dr. Washington responded to the question about her being interested in returning to UMES by saying: "No I don't want to go back there").

Dr. Washington states in her declaration that "[n]otwithstanding what I said at my deposition, I would like to keep my options open as to returning to UMES after I obtain a judgment in this case." ECF 85-1, at 10 ¶ 113. Defendants argue that this "contradiction of her previous

sworn testimony does not suffice to raise a genuine dispute of fact sufficient to overcome summary judgment." ECF 92, at 8 (citing *Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 638 (4th Cir. 2023), which states: "It is well established that 'a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' because to allow that 'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984))). The Court finds Defendants' argument persuasive.

First, Defendants essentially argue that Dr. Washington's deposition statements should be treated as a judicial admission. *See* ECF 92, at 7–8 (couching this concept with the term "abandon[ment]," a concept much like that of waiver and judicial admission); *see also Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) (noting "a judicial admission is in the nature of a waiver"). "A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them."[10] *Martinez v. Bally's La., Inc.*, 244 F.3d

---

[10] There is a scarcity of federal caselaw on whether unequivocal statements made in deposition testimony constitute a judicial admission, or mere evidentiary admissions. *See Luna v. Luna*, 474 P.3d 966, 972–73 (Utah 2020) (providing an overview of the differences in opinion and caselaw in this debate). The Fourth Circuit briefly addressed a related issue once in an unpublished opinion. *See Managed Care Pros., Inc. v. Medlantic Healthcare Grp.*, Nos. 97-2158, 97-2159, 1998 WL 704458, at *4 n.2 (4th Cir. 1998) (agreeing with the Seventh Circuit that "[w]hen a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat the testimony as solely an evidentiary admission" (quoting *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995))). By contrast, the Fourth Circuit has at times treated the contents of a complaint—as opposed to statements in a deposition—as judicial admissions. *See, e.g., Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994) (treating a complaint's characterization of a contract as one for the sale of securities as a judicial admission where deposition testimony later contradicted the complaint's characterization). Numerous other courts have held that deposition testimony does not give rise to a judicial admission, and that such an admission can be retracted by trial testimony. *See, e.g., Hurtado v. Balerno Int'l Ltd.*, 408 F. Supp. 3d 1315, 1329 (S.D. Fla. 2019); *Goldman Sachs Tr. Co., N.A. v. Falls*, Civ. No. 5:14-777-FL, 2018 WL 3249480, at *2–3 (E.D.N.C. Mar. 20, 2018) (declining to treat statements in a deposition as a judicial admission when they were not clear and unequivocal).

474, 476 (5th Cir. 2001); *Armour v. Knowles*, 512 F.3d 147, 156 n.13 (5th Cir. 2007) ("The binding nature of judicial admissions conserves judicial resources by avoiding the need for disputatious discovery on every conceivable question of fact."). The applicability of this doctrine to *Ex Parte Young* is unclear, given that "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).

Yet it is not lost on the Court that the rationale underlying the general rule that reinstatement constitutes prospective relief is ill-fitted to this case. A court may classify a plaintiff's request for reinstatement as prospective (as opposed to a backwards-looking correction of a past termination) because it is the ongoing denial of employment that constitutes an *ongoing* violation of a right. *Bland*, 730 F.3d at 390. Reinstatement is remedying the ongoing deprivation, not the past termination. *See id.* Thus, it can hardly be said that the ongoing action of an employer-defendant failing to reinstate a plaintiff to a position the plaintiff no longer wants constitutes an *ongoing* violation of a right.

It should come as no surprise then that other courts have routinely dismissed claims for equitable relief of reinstatement where the plaintiff either no longer affirmatively seeks or desires the job. *See Ackerman v. Graziano*, Civ. No. 19-1811, 2022 WL 2068830, at *12 (D.S.C. Mar. 22, 2022) ("However, in [plaintiff's] deposition, the plaintiff unequivocally testified that he is not seeking reinstatement.⁰ . . . Because of this testimony, the undersigned finds that the plaintiff is bound by his clear and unambiguous statement under oath that he is not seeking this relief." (internal citation and footnote omitted)), *report and recommendation adopted*, Civ. No. 19-1811, 2022 WL 1638770 (D.S.C. May 24, 2022); *see also Long v. E. N.M. Univ. Bd. or Regents*, Civ. No. 13-380, 2015 WL 13665468, at *3 (D.N.M. Mar. 23, 2015) ("Given the evidence and legal-

determination of Plaintiff's permanent disability, the Court cannot in good conscience permit Plaintiff to pursue reinstatement."); *Dube v. Tex. Health & Hum. Servs. Comm'n*, Civ. No. SA-11 -354, 2012 WL 2397566, at *3 (W.D. Tex. June 25, 2012) (finding that a "plaintiff waived her claim of reinstatement" when she said in a deposition that she was not "interested in coming back to work" at her former job but, in response to defendant's motion for summary judgment, stated in an affidavit that though she "[did] not really like the idea of having to move back to Texas, if I win this case, and I am eligible for reinstatement, I want to be reinstated"); *McKnight v. Gen. Motors Corp.*, 768 F. Supp. 675, 680 (E.D. Wis. 1991) ("Title VII would not be served by placing the plaintiff in a job he does not want."), *vacated in part*, No. 87-C-248, 1992 WL 92770 (E.D. Wis. Apr. 22, 1992), *vacated*, No. 87-C-248, 1992 WL 126297 (E.D. Wis. June 2, 1992), *and judgment reinstated*, No. 87-C-248, 1992 WL 126297 (E.D. Wis. June 2, 1992), *and aff'd*, 973 F.2d 1366 (7th Cir. 1992); *Bleimehl v. Eastman Kodak Co. Clinical Diagnostic Div.*, Civ. No. 4-93-30702, 1997 WL 33322218, at *13 (S.D. Iowa Jan. 27, 1997) (rejecting a claim for reinstatement because "[t]he Court will not order equitable relief which has not been requested and is affirmatively rejected by the party it would benefit"); *Collins v. Chem. Coatings, Inc.*, Civ No. 7-116, 2010 WL 1404619, at *5 (W.D.N.C. Mar. 31, 2010) (granting summary judgment for the defendants on the plaintiff's Title VII claims and noting that "[b]ecause [the plaintiff] has not explained the disparity in her testimony in this case, she is bound by the earlier statements in her deposition.").

Second, the Court recognizes that it is Plaintiff's burden to affirmatively establish the applicability of the *Ex Parte Young* exception. *Singh*, 659 F. Supp. 3d at 678. Of the cases Plaintiff cites, none involve a plaintiff equivocating on the desired relief of reinstatement. *See* ECF 85, at 51–55; *e.g., Roberts v. Off. of the Sheriff for Charles Cnty.*, Civ. No. DKC 10-3359, 2012 WL

12762 (D. Md. Jan. 3, 2012) (involving a plaintiff seeking his personnel file be purged, without any equivocation); *Coakley v. Welch*, 877 F.2d 304, 307 n.2 (4th Cir. 1989) (lacking any equivocation on the part of the plaintiff, and noting that the rationale for permitting injunctive relief for reinstatement is that the defendant's "conduct [], while no longer giving [plaintiff] daily attention, continues to harm him by preventing him from obtaining the benefits of [defendant's] employment").

Ultimately, the Court need not decide the question of whether an equivocal request for reinstatement that was arguably abandoned can support an ongoing violation of a right sufficient to qualify under *Ex Parte Young*, because even if Dr. Washington's reinstatement request does fall under *Ex Parte Young*, Plaintiff has not created a genuine dispute of material fact sufficient to support the claim for reinstatement.

Reinstatement is an equitable remedy that can only be ordered by the Court. *See Hunter v. Town of Mocksville*, 897 F.3d 538, 562 (4th Cir. 2018) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991)). "Generally, in order to accept the remedy of reinstatement, a plaintiff must be ready, willing, and able to work." *Long*, 2015 WL 13665468, at *3. There is no question that Dr. Washington unequivocally stated at her deposition, under oath, that she has no desire to return to UMES. *See* ECF 78-2, at 51, 87:14–20. Putting aside the fact that "a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting [her] own prior testimony," *Hannah*, 72 F.4th at 638 (citations omitted), Dr. Washington's declaration does little to undermine the clear and unequivocal statement made at her deposition. *See generally* ECF 85-1. Her declaration reflects that she "would like to keep [her] options open as to returning to UMES after [she] obtain[s] a judgment in this case." *Id.* at 10 ¶ 113. Interpreted most favorably to her, she merely pledges to *consider* a *possible* return to

26

UMES, in some role, at the conclusion of the case. Indeed, Plaintiff's counsel confirms that Plaintiff does not seek re-instatement to her former position, but instead "might be willing" to accept a position that does not exist—and one she did not previously hold—remotely directing the counseling center. ECF 85, at 55 ("However, considering her current health and finances, [Plaintiff] might be willing to return if the job were remote, and in any case prefers to keep her options open at this time.").[11] Simply stated, there is no dispute of material fact that Plaintiff does not want her job back at UMES and thus would be unsuccessful at trial on a claim seeking this relief.

### ii.    Judicial Oversight and Posted Notices

Dismissal is appropriate as to the remaining claims for equitable relief. *See Young v. Lynch*, 846 F.2d 960, 962 (4th Cir. 1988) (noting that in the absence of claims for damages, a court may decide the equitable issues without a jury). Plaintiff includes in her amended complaint a demand for "[r]eview and judicial oversight and management training, for the Defendant's Human Resources and Title IX offices, for the purpose of correcting the blatant failure of those authorities to properly handle discrimination complaints like Dr. Washington's." ECF 15, at 20. She also demands that the Court order "[p]osting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws." *Id.* at 21. As requested, this relief is barred by the Eleventh Amendment since, as Defendants note, it "relates exclusively to past conduct" and there is no allegation "that the University's current training practices are in any way

---

[11] It should be noted that simply because Dr. Washington may not be interested in reinstatement does not merit dismissal of her claim as incompatible with *Ex parte Young. See Verizon Md., Inc.*, 535 U.S. at 646 ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim"). However, that Dr. Washington unequivocally swore that she has no interest in returning to UMES is a fact the Court must consider as it exercises its obligation to ensure that "factually unsupported claims" do not proceed to trial. *Bouchat*, 346 F.3d at 526.

deficient." ECF 92, at 9 (citing *Diven v. Souders*, Civ. No. 21-1276-BAH, 2024 WL 308941, *9 (D. Md. Jan. 26, 2024)).

Dr. Washington notes in her Opposition that she is also seeking "front pay," ECF 85, at 52, and "cleansing of the firing from her employment record." *Id.* A demand for a modification to Dr. Washington's personnel record may qualify as prospective relief under *Ex parte Young*. *See Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 516 (6th Cir. 2023) ("We have held in analogous contexts that expungement of negative government records pertaining to an aggrieved individual may qualify as prospective relief to remedy a constitutional violation."); *Doe v. Loh*, Civ. No. PX-16-3314, 2018 WL 1535495, at *4 (D. Md. Mar. 29, 2018), *aff'd*, 767 F. App'x 489 (4th Cir. 2019) (noting that expungement of records is the type of injunctive relief subject to "the *Ex Parte Young* exception" and collecting cases). However, as with the demand for front pay, "these allegations appear nowhere in the complaint; instead, they surface for the first time in plaintiff['s] opposition brief." *Altitude Acad. of Barbering LLC v. Pitt Cmty. Coll.*, Civ. No. 23-80, 2024 WL 1705230, at *5 (E.D.N.C. Apr. 19, 2024). "[I]t is well-established that parties cannot amend their complaints through briefing or oral advocacy." *Id.* (citing *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)). And as to the front pay demand, "to the extent that the claims seek monetary relief, they are claims against an arm of the State" and are barred by the Eleventh Amendment. *Bland*, 730 F.3d at 390–91 (citing *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223 (4th Cir. 2001)). Accordingly, these requests for equitable relief are dismissed.[12]

---

[12] Finally, Dr. Washington requests attorney's fees. ECF 15, at 16 ¶ 131. The Eleventh Amendment does not bar a plaintiff's request for attorney's fees for meritorious claims proceeding under § 1983. *See* 42 U.S.C. § 1988 (permitting a court to award a prevailing party in a § 1983 claim reasonable attorney's fees). Given the Court grants Defendants' Motion, however, Plaintiff is not entitled to attorney's fees. *See Wyoming Gun Owners v. Gray*, 83 F.4th 1224, 1251 n.9 (10th

In sum, Count II is dismissed. *See supra* Section III.B.1. Count VI is dismissed against official capacity defendants Dr. Harpe and Ms. Billie, *see supra* Section III.B.2; *see also infra* Section III.C. (dismissing Count VI against Dr. Harpe and Ms. Billie in their personal capacities), and summary judgment is granted as to Count V. *See supra* Section III.B.3.

C.    **Dr. Harpe and Ms. Billie are Entitled to Summary Judgment on Count VI.**

In Count VI of the Amended Complaint, Dr. Washington asserts a claim of discriminatory termination against Dr. Harpe and Ms. Billie in their personal capacities. ECF 15, at 17. Defendants argue that Ms. Billie is entitled to summary judgment on this count because she was not personally involved in the decision to terminate Dr. Washington, ECF 78-1, at 22–24. As it relates to Dr. Harpe, Defendants argue Dr. Washington cannot establish either a prima facie case of discrimination or that the legitimate, non-discriminatory reasons for her termination were pretextual. *Id.* at 24–27.

1.    Ms. Billie

Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting "under color of" state law. 42 U.S.C. § 1983. To establish personal liability under § 1983, the plaintiff must "affirmatively show[] that the official charged *acted personally* in the deprivation of the plaintiff's rights." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) (emphasis added) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (the official's "own individual actions" must have "violated the Constitution"). "Mere knowledge of such a deprivation does not suffice."

---

Cir. 2023) (noting plaintiff could not collect § 1988 fees, "which are reserved for victors in § 1983 litigation").

*Williamson*, 912 F.3d at 171 (citing *Wright*, 766 F.2d at 850); *Vanterpool v. Cuccinelli*, 998 F. Supp. 2d 451, 464 (E.D. Va. 2014).

Defendants argue that Ms. Billie is entitled to summary judgment as a matter of law because Dr. Washington has not alleged that Ms. Billie was personally involved in the decision to terminate her employment. ECF 78-1, at 23; ECF 78-6, at 27, 58:9–11. Dr. Washington does not contest this, ECF 85, at 40–41, but argues instead that her § 1983 claim may proceed because she alleges that Ms. Billie failed to "intervene and preempt the discriminatory/retaliatory firing." *Id.* at 40 (noting that individuals may "be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability" (citing *Rall v. Hobbs Mun. Sch. Dist.*, Civ. No. 15-0518, 2016 WL 10588125, at *9 (D.N.M. Mar. 16, 2016))).

However, Defendants note that outside the supervisory context, deliberate indifference to a constitutional violation by others is insufficient to impose liability under § 1983. *See* ECF 92, at 13 (citing *Vanterpool*, 998 F. Supp. 2d at 465 n.11). And as Ms. Billie was never Dr. Washington's supervisor, Defendants contend, a theory of deliberate indifference is insufficient as a matter of law to support § 1983 liability. *Id.* Dr. Washington provides no caselaw to suggest otherwise. *See* ECF 85, at 40–41. The only case cited in Dr. Washington's brief on this point, *Rall v. Hobbs Municipal School District*, confirms Dr. Washington's failure to adequately allege Ms. Billie was personally involved in the constitutional violation alleged here. 2016 WL 10588125, at *4 (noting "[p]ersonal liability under § 1983 must be based on personal involvement in the alleged constitutional violation" and that "[s]upervisory liability allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured

by the Constitution. . . ." (cleaned up) (internal citations and quotation marks omitted)). Dr. Washington's assertion to the contrary—that knowledge may be sufficient to establish personal liability—relies on a quote Dr. Washington pulled from *Rall*'s discussion of supervisory liability and "the supervisor's . . . knowledge of the violation and acquiescence in its continuance." *Id.* at *9 (cleaned up) (citation omitted).

The Court agrees with Defendants that as it relates to Ms. Billie, it is undisputed that she was not involved in the decision to terminate Dr. Washington and Dr. Washington's reliance on a theory of deliberate indifference is insufficient as a matter of law where, as here, Ms. Billie was not Dr. Washington's supervisor. ECF 78-1, at 37. Dr. Washington's Count VI against Ms. Billie is dismissed.

### 2. Dr. Harpe

As it relates to Dr. Harpe, Defendants allege that Dr. Washington fails to establish a prima facie case of discrimination and Dr. Washington cannot demonstrate that the legitimate, non-discriminatory reasons for her termination were pretextual. ECF 78-1, at 24. Dr. Washington disagrees. ECF 85, at 42–50.

Claims of discrimination under § 1983 are analyzed under the same legal framework as claims under Title VII of the Civil Rights Act of 1964. *See, e.g., Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (noting elements to establish a circumstantial case under Title VII and 42 U.S.C. § 1983 are the same); *Vicino v. Maryland*, 982 F. Supp. 2d 601, 609 (D. Md. 2013) (noting Title VII and § 1983 claims are analyzed "identically on their merits").

Courts analyze these claims via a three-step scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), in which the plaintiff bears the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *Evans v. Techs.*

*Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996); *Gibson v. Md. Motor Vehicle Admin.*, Civ. No. 20-3220-BAH, 2024 WL 51132, at *7 (D. Md. Jan. 4, 2024). If the plaintiff meets this burden, the defendant-employer can rebut the presumption of discrimination by presenting evidence of a legitimate, non-discriminatory reason for its employment actions. *Evans*, 80 F.3d at 959. If the defendant-employer provides this reason, the presumption of discrimination "drops out of the picture" and the burden shifts back to the plaintiff to demonstrate that the defendant's rationale is pretextual. *Id.* Nevertheless, the "plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Id.* (citing *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Additionally, courts must take special care when considering a motion for summary judgment in a discrimination case because "motive is often the critical issue." *Evans*, 80 F.3d at 958. Nevertheless, a "summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Id.* at 958–59 (citing *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987)). If, however, a reasonable jury could return a verdict for Dr. Washington, then a genuine factual dispute exists, and summary judgment is improper. *Id.* at 159 (citing *Anderson*, 477 U.S. at 247).

To establish a prima facie case of sex-based discrimination, Dr. Washington must show "that (1) [she] is a member of a protected class; (2) [she] suffered adverse employment action; (3) [she] was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Defendants contend Dr. Washington fails to establish the third and fourth elements of a prima facie case. *See* ECF 78-1, at 25–26.

Defendants point to numerous complaints from students, faculty, and staff, indicating that Dr. Washington was "overly intrusive," "abrasive," and "unprofessional." *Id.* at 26 (listing exhibits); *see also* ECF 78-10 (including a student complaint describing an incident in which Dr. Washington was "asking too many personal questions" concerning "the time [the student] was raped," and invited the student's boyfriend into the room without permission and began "asking him questions about [the rape]," which made the student "uncomfortable"); ECF 78-13, at 2 (including a complaint from IT staff indicating Dr. Washington's interactions with the IT helpdesk was "pushy and unprofessional"); ECF 78-14, at 9 (including a complaint from student, B.W., about Dr. Washington "retaliating against" the student, acting "incredibly unprofessional," and being "aggressive and threatening"); ECF 78-15, at 2 (including a complaint from Ms. Billie after observing Dr. Washington's treatment of student B.W., stating: "I want you to know that I found [Dr. Washington's] behavior and interaction with [B.W.] highly inappropriate, provocative, and counter-productive. I have never seen an employee attack a student in this manner. This was highly inappropriate behavior especially for someone in the 'helping' profession").

Beyond interpersonal complaints, Defendants point to deficiencies in Dr. Washington's management of administrative tasks, including Dr. Washington's failure to turn in timely quarterly reports and jeopardizing UMES' Title III funding for the Counseling Center. *See* ECF 78-1, at 26; *see also* ECF 78-21, at 2 (attaching an email from the Title III Coordinator to Dr. Washington noting "several attempts" to obtain her quarterly report that was past due); ECF 78-22, at 3 (including an email chain in which the Title III Director informed Dr. Washington and Dr. Harpe, among others, "that it is a privilege and honor to receive Title III funds and not an entitlement" and "if your office is unable to abide by Title III Program rules and guidelines, it will be my recommendation to the President that your activity be terminated by the end of September 2017").

When the report was eventually submitted, Dr. Washington indicated she completed it, while Defendants provide evidence Dr. Washington had another colleague complete the report for her. *Compare* ECF 78-27, at 2 (including email from Dr. Washington to Dr. Harpe indicating she had completed the required midyear report) *with* ECF 78-28, at 2 (including email from Kathy Kent to Dr. Harpe, indicating Dr. Washington "asked [Ms. Kent] to help her with her report" and Dr. Washington "ended up giving all her materials to [Ms. Kent] for the mid-term report and having [Ms. Kent] write it").

Additionally, Defendants assert Dr. Washington failed "to provide management and oversight on the Morehouse Grant for which she served as Principal Investigator." *See* ECF 78-1, at 26; *see* ECF 78-23, at 2–3 (including email chain in which the grant writer, Sylvia Quinton, declined Dr. Washington's requests to meet given Ms. Quinton was not responsible for the "implementation of the grant," which prompted Dr. Washington to reply: "Please help me understand why you have decided to no longer be part of this process after all of this **length of time?** And, why have you decided to stop being part of the <u>decision making process</u> and <u>implementation of the monies</u>?" thereby prompting Dr. Harpe to intervene and tell Dr. Washington "You are the Principal Investigator (PI) for this grant. . . . you are responsible for this initiative." (emphasis in original)).

Dr. Harpe had also received complaints about Dr. Washington's absenteeism and failure to provide adequate staffing and coverage for the Counseling Center. *See* ECF 78-9, at 64–66, 139:3–141:18. Dr. Harpe also testified "Dr. Washington's writing skills were . . .not up to standard." *Id.* at 56, 128:11–12; *id.* at 57, 129:7–13 (noting her Title III reports were "ill-prepared. . . . they were full of grammatical errors. . . . It was just not appropriately done. . . . So

several times [Dr. Harpe] had to re-do what was done by Dr. Washington because [he] was under time constraints").

Dr. Washington argues she has established a prima facie case of sex-based termination. *See* ECF 85, at 34–38. Regarding her performance, Dr. Washington argues that (1) Dr. White approved of her performance, (2) that the test for whether an employee met her employer's reasonable expectations is relatively easy to meet, and (3) that "it is forbidden to [] use the defendant's alleged nondiscriminatory firing reason, to assess whether the plaintiff met his prima facie case." *Id.* at 35 (citing *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 662 (6th Cir. 1999); *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 865 (D. Md. 2000) ("a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for [the adverse employment action.]").

To start, Dr. Washington appears to misconstrue the burden by criticizing Defendants' evidence as "fail[ing] to knock the discriminatory firing claim out for lack of a prima facie case." ECF 85, at 36. Even disregarding Defendants' evidence of complaints from students, faculty, and staff, Dr. Washington still bears the burden of demonstrating she was performing her job duties at a level that met her employer's legitimate expectations at the time of her termination. *Evans*, 80 F.3d at 959; *Gibson*, 2024 WL 51132, at *7. Yet the only evidence Dr. Washington provides of her satisfying her employer's legitimate expectations comes from: (1) a recommendation letter written by her former supervisor, Dr. White, 18 months after her termination, ECF 85-4, at 1–2 (including the letter of recommendation dated October 5, 2018); and (2) self-serving recollections of receiving praise. *Compare* ECF 78-47 (Dr. Washington's Response to Interrogatories), at 8 (indicating "[Dr. Harpe] praised her for taking initiative" and "praised [Dr.] Washington for working with the athletic department and increasing Counseling Center clientele"), *with* ECF 85-

8, at 17, 33:12–14 (indicating Dr. White only recalled "general praise or thank you for doing something. That's about it"); *and id.* at 15–16, 31:16–32:17 (indicating Dr. White recalled that generally Dr. Harpe "always had something good to say about all of his Directors at any given time").

There are obvious challenges with relying on a recommendation letter for a full and complete assessment of an employee's performance. For instance, Dr. White testified he would "never" use a letter of recommendation to discuss an employee's weaknesses and testified he "[used] a boilerplate," template for Dr. Washington's recommendation letter as it was "easier on [Dr. White] to move around names and dates." ECF 85-8, at 51, 108:3–12. While Dr. White customized portions of the letter, he acknowledged the last two paragraphs, in which he praised Dr. Washington for being a "consummate professional who is concerned and committed to the wellbeing of her students," were boilerplate. *Id.* at 62, 119:19–20; *see generally* ECF 85-4, at 1–2.

Defendants argue that Dr. White's letter does not create a genuine issue of fact as to whether Dr. Washington was performing at a level that met her employer's legitimate expectations because even if Dr. White had a favorable opinion of Dr. Washington, Dr. White did not have the authority to terminate Dr. Washington's employment, was not privy to all of the complaints Dr. Harpe received about her performance, and did not participate in the decision to terminate her. ECF 92, at 15 (citing *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (on the issue of satisfactory job performance, "'[i]t is the perception of the decision-maker which is relevant,' not the self-assessment of the plaintiff") (citations omitted) (emphasis added)); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of [plaintiff's] co-workers as to the quality of her work are similarly close to irrelevant.") (citation omitted);

*Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) ("[A]lthough the affidavits put forth by [plaintiff] document the fact that certain co-workers, Bank customers and attorneys believed [plaintiff] was doing a good job, they fail to address whether management honestly believed that [plaintiff] was doing a good job.").

Finally, Dr. Washington asserts that the fact that she was praised is evidence of her satisfactory performance. *See* ECF 85, at 15 (citing ECF 78-47, at 8, in which Dr. Washington said Dr. Harpe praised her for "taking initiative" and "praised [her] for working with the athletic department and increasing Counseling Center clientele"). *But see* ECF 85-8 (White Deposition), at 11, 27:12–28:9 (noting Dr. Harpe discussed terminating Dr. Washington with Dr. White two or three times before Dr. White stopped working in February 2017); *id.* at 46, 82:12–18 (noting Dr. Harpe's "collection of concerns" relating to Dr. Washington's "interactions with students, faculty, and/or staff"); *id.* at 47, 83:16–19 (indicating Dr. White was not surprised that Dr. Washington was terminated "because it was something that was a possibility").

Dr. Washington's recollection of being praised by Dr. Harpe, at least twice, does not demonstrate that Dr. Washington was performing satisfactorily. *See Frank v. England*, 313 F. Supp. 2d 532, 538 (D. Md. 2004) (holding that "simply maintain[ing] that [a plaintiff] thought he was following the standard procedures" provided "no evidence that his performance was satisfactory"). Similar to *Frank*, Dr. Washington's belated letter of recommendation and few recollections of praise do not establish a triable issue of fact that Dr. Washington was performing satisfactorily since it "provide[s] no evidence that [her] performance was satisfactory." *Id.* Plus, "Defendant has provided clear evidence that Plaintiff was not performing [her] duties in an acceptable manner." *Id.* at 538. Because the Court finds this issue dispositive, the Court need not address Defendants' alternative arguments that Dr. Washington failed to establish the fourth

37

element of a prima facie case of sex discrimination, and alternatively that Dr. Washington failed to demonstrate pretext.

In sum, Count VI against Ms. Billie and Dr. Harpe in their personal capacities is dismissed; *see also supra* Section III.B.2 (dismissing Count VI against Ms. Billie and Dr. Harpe in their official capacities).

### D. Defendants are Entitled to Summary Judgment on Count III.

In Count III of the Amended Complaint Dr. Washington asserts a hostile work environment claim against Dr. Harpe, Ms. Billie, and Mr. Rudasill in their individual capacities for damages. ECF 15, at 14. First, as it relates to Mr. Rudasill, Dr. Washington concedes Mr. Rudasill is entitled to summary judgment. *See* ECF 85, at 34 n.52 ("[Dr.] Washington is conceding summary judgment to Defendant Rudasill as a personal capacity party-defendant[.]"). Count III against Mr. Rudasill is therefore, dismissed. The Court addresses the remaining Defendants at issue below.

#### 1. Ms. Billie

As it relates to Ms. Billie, Dr. Washington's Opposition fails to address any of Defendants' arguments that Ms. Billie is also entitled to summary judgment on this claim. *See* ECF 85, at 25–33 (addressing only the hostile work environment claim against Dr. Harpe and merely mentioning Ms. Billie was aware of the hostile work environment). As noted above, *supra* Section III.B.2, failing to address those arguments or argue to the contrary constitutes an abandonment of Dr. Washington's hostile work environment claim against Ms. Billie. *See Ferdinand-Davenport*, 742 F. Supp. 2d at 783 (noting plaintiff's failure to address defendant's arguments in plaintiff's opposition to defendant's dispositive motion constituted an abandonment of plaintiff's claims); *Mentch*, 949 F. Supp. at 1247 (same).

2.    Dr. Harpe

As noted above, *supra* Section III.C.2, courts apply the same legal standard developed for

hostile work environment claims under Title VII to claims for hostile work environment under

§ 1983. *See Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *see also Riley v. Buckner*, 1 F.

App'x 130, 133 (4th Cir. 2001) ("Our precedent applies the standards developed for hostile work

environment claims under Title VII to claims for sexual harassment under section 1983."). To

state a hostile work environment claim, a plaintiff must demonstrate that: (1) she experienced

unwelcome harassment; (2) the harassment was based on her protected status; (3) the harassment

was sufficiently severe or pervasive to alter the conditions of employment and create an abusive

work environment; and (4) there is some basis for imposing liability on the employer. *Holloway*

*v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324

F.3d 761, 765 (4th Cir. 2003) and *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)). Defendants

argue that Dr. Washington has failed to demonstrate the third element as to Dr. Harpe. *See* ECF

78-1, at 29–30. Dr. Washington disagrees. ECF 85, at 7–10.

Conduct is actionable only if it creates both an objectively and subjectively hostile work

environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (noting this standard is a

"middle path between making actionable any conduct that is merely offensive and requiring the

conduct to cause a tangible psychological injury"); *id.* at 22 (noting "[t]his is not, and by its nature

cannot be, a mathematically precise test"). In analyzing whether conduct is "severe or pervasive"

under the objective inquiry a court must "look at all the circumstances, including the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quotation marks

omitted). This is a "high bar." *Id.*; *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).

"[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference· of opinion and personality conflict with [one's] supervisor, are not actionable" under Title VII. *Id.* (quoting *Sunbelt Rentals, Inc.*, 521 F.3d at 315–16) (citations omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks and citations omitted)); *Harris*, 510 U.S. at 21 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment . . . ." (internal citation and quotation marks omitted)).

Dr. Washington alleges the following conduct is sufficiently "severe or pervasive" to generate a factual dispute: "one time [Dr.] Harpe and I walked to the gym and during the walk across the yard he said I needed a man like him," ECF 85-1, at 3 ¶ 23; Dr. Harpe once said Dr. Washington was "a strong black woman but no man would ever want [her] because of that, but that he knew how to handle [her]," *id.* at 4 ¶ 35; Dr. Harpe told Dr. Washington "You're like Harriet Tubman," *id.* ¶ 38; Dr. Harpe told Dr. Washington that she should stop "talk[ing] with [her] hands," *id.* ¶ 39; Dr. Harpe gave Dr. Washington contradictory feedback to be more, and at the same time, less assertive, *id.* ¶¶ 40–41; Dr. Harpe told Dr. Washington he "knew how to handle" her, *id.* ¶ 44; and that he was "not intimidated because [he is] an alpha male," *id.* at 9 ¶ 96, and that he would "run [his] staff like the military," *id.*

Dr. Washington asserts Dr. Harpe made these comments to her when they were alone, and overall estimates she was alone with Dr. Harpe perhaps "10-20 times, either in his office or outside" during her seven months of employment. *Id.* at 3 ¶ 24. While Dr. Washington acknowledges Dr. Harpe never touched her, propositioned her, gave gifts to her, or used sexually

explicit language, ECF 78-2, at 137, 205:5–6; ECF 85-1, at 3 ¶ 28, Dr. Washington notes Dr. Harpe would say the above comments while "standing too close" to her, ECF 85-1, at 3 ¶ 53, and Dr. Washington believes Dr. Harpe was "attempt[ing] to eventually get [her] to have sex with him," *id.* ¶ 28. To substantiate this belief, Dr. Washington points to a New York Times bestselling book entitled *"The Game: Penetrating the Society of Pickup Artists"* to suggest that Dr. Harpe read the book and was employing its suggested pickup tactics against Dr. Washington. *See* ECF 85-1, at 3 ¶ 29 ("[I]t appears [to] me that some of Dr. Harpe's actions toward me were those of an aspiring pickup artist, as they could have been lifted right from that best-selling book, *"The Game: Penetrating the Society of Pickup Artists."*).

Next, Dr. Washington analogizes the factual allegations in this case loosely to those in *Hernandez v. Fairfax Cnty.*, 719 F. App'x 184 (4th Cir. 2018) (per curiam), wherein a plaintiff's supervisor physically invaded the plaintiff's personal space on numerous occasions "including blocking her path in the hallway, placing his chin on her shoulder, and positioning his body 'right up against' her." *Id.* at 186. The supervisor also made sexually suggestive comments to her indicating his desire to see her in a bathing suit, and once asked plaintiff, a female firefighter, whether she would "be able to handle that big hose," which plaintiff construed as "being sexual in nature." *Id.* Additionally, the supervisor "started tracking what [plaintiff] was doing at the station, who [she] was talking to, how [she] was doing certain things, [and] who [she] was giving hugs to." *Id.* at 188. The record showed the supervisor had "compiled multiple binders with information" he collected about the plaintiff. *Id.* The Fourth Circuit found the conduct, when viewed in totality, to be sufficiently severe or pervasive to survive a summary judgment motion. *Id.* at 189.

However, the facts Dr. Washington alleges are distinguishable as she does not allege physical touching or stalking, both of which can intimidate or threaten someone, and thus are more likely to constitute "severe or pervasive" conduct. *See, e.g., Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 n.4 (4th Cir. 2015) (holding that the Plaintiff's manager stalking, screaming in her face, and spitting on her, could all be considered evidence of severe or pervasive harassment); *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 412 (D. Md. 2015) (holding plaintiff adequately alleged supervisor's conduct was severe or pervasive when she alleged, among other things, stalking-like behavior).

Defendants instead analogize this case to *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766 (4th Cir. 1997), which the Court agrees is more comparable. ECF 78-1, at 33. In *Hartsell*, a sales associate brought a Title VII claim alleging that during her employment her co-worker, especially salespeople, made demeaning comments about women, including: "We've made every female in this office cry like a baby. We will do the same to you. Just give us time. We will find your weakness"; referring to the sales assistants as "little people" while the salespeople were "important people playing in the big leagues"; that plaintiff "didn't understand" as that she was "not in [the salespeople's] league"; one employee referred to his former sales assistant as his "slave" and told plaintiff "she too would become the slave"; and in one incident after seeing in the company magazine a woman who "was rather buxom and was wearing a lowcut T-shirt," a male employee asked another male employee in plaintiff's presence, "[W]hy don't we have sales assistants that look like that [?]" and the other employee agreed; after the birth of her child, plaintiff was asked if she would be a "mini-van driving mommy" or "be a salesperson and play with the big boys"; and in one incident plaintiff was asked "[W]hy don't you go home and fetch your husband's

slippers like a good little wife, that's exactly what my wife is going to do for me." *Hartsell*, 123 F.3d at 768–69.

The Fourth Circuit found it notable that several of the allegedly offensive comments catalogued by the plaintiff in *Hartsell* were not even related to her gender and were instead dependent on status within the workplace. *Id.* at 772. Additionally, the Fourth Circuit noted the lack of physical contact, the lack of propositioning, and lack of sexually explicit conduct. *See id.* at 773; *see also Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("[Defendant] never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures.").

Just as in *Hartsell*, Dr. Harpe allegedly made statements that could be viewed as misogynistic, outdated, demeaning, patronizing, and inappropriate, but there is no allegation that Dr. Harpe touched Dr. Washington, ECF 78-2, 132, at 200:5–6, exposed himself or provided sexually explicit material to her, *id.* at 200:3–6; 204:15–205:6, made lewd or dirty jokes to her, *id.* at 204:20–205:1, or any claim that Dr. Harpe asked Dr. Washington out on a date or attempted to give her a gift. *Id.* at 137, 205:2–6. While those things are by no means the exclusive forms of "severe or pervasive" sexual harassment, *see Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331–32 (4th Cir. 2003); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000), they stand as a proper foil to the more "boorish" behavior at issue in this case. *See, e.g., Baskerville*, 50 F.3d at 430 ("On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.") (citations omitted);

43

*EEOC v. R&R Ventures*, 244 F.3d 334, 339 (4th Cir. 2001) ("Boorish behavior may exist apart from any propensity to discriminate.").

Dr. Washington relies on an inaccurate reading of *Hartsell* as she attempts to distinguish Defendants' comparison. ECF 85, at 32. Dr. Washington argues that in this case Dr. Harpe's comments "unquestionably relate directly to Dr. Washington's sex" and in *Hartsell* the comments calling women "little people" and "slave" were too disconnected from the plaintiff's sex to be cognizable. *Id.* This, of course, overlooks that there were also sex-based comments in *Hartsell*, such as: "We've made every female in this office cry like a baby" and "go home and fetch your husband's slippers like a good little wife." *See Hartsell*, 123 F.3d at 768–69. This also overlooks that there are sex-neutral statements in Dr. Washington's allegations too. *See* ECF 85-1, at 9 ¶ 96 (alleging Dr. Harpe would say he would run his office "like the military"); ECF 85-1, at 4 ¶ 39 (alleging Dr. Harpe would say Dr. Washington "had the right job, but was in the wrong place").

Additionally, the frequency of the comments is too infrequent to constitute severe or pervasive conduct. *Compare Singleton v. Dep't of Corr. Educ.*, 115 F. App'x 119, 122 (4th Cir. 2004) (finding six months of flirtation and inappropriate comments were not objectively severe or pervasive) *with Hernandez*, 719 F. App'x at 187–88 (finding stalking and unwanted flirtations daily for over a year was sufficient to survive summary judgment). While "inappropriate comments made multiple times a week over the course of a year is at the borderline of surviving summary judgment," *Walker v. Wilkie*, Civ. No. 19-00249, 2020 WL 497136, at *6 (W.D.N.C. Jan. 30, 2020) (citing *Walker v. Mod-U-Kraf Homes*, 775 F.3d 202, 207–10 (4th Cir. 2014)), here Dr. Washington alleges inappropriate comments made in private that occurred approximately two times a month for seven months, ECF 85-1, at 2 ¶ 12.

44

Furthermore, as Defendants argue, far more offensive conduct has been found to not clear this "high bar" posed by the "severe or pervasive" element. *See Singleton*, 115 F. App'x at 122 (holding plaintiff's allegations did not constitute "severe or pervasive" sexual harassment when Plaintiff complained that approximately four times a week for a year and a half plaintiff's coworkers would say she should be "spanked," stare at her breasts, and repeatedly make comments about how attractive she was, and her supervisor had a security camera installed in her office to observe her); *Hartsell*, 123 F.3d at 768–69, 723 (finding plaintiff did not meet the "severe or pervasive" despite making misogynistic comments that a female employee should go "fetch [her] husband's slippers like a good little wife" and asking whether she would be a "mini-van driving mommy" or "be a salesperson and play with the big boys"); *Freeman v. Sci. Applications Int'l Corp.*, Civ. No. 19-1502, 2020 WL 6928610, *1, *6–7 (E.D. Va. Nov. 24, 2020) (holding female supervisor's conduct was not sufficiently severe or pervasive where she allegedly touched the plaintiff inappropriately "two to three times a day," including incidents where she stared at the plaintiff's groin during a meeting in her office, put her hand on his shoulder and sighed, grabbed his arm and commented on his bicep, playfully touched his lower back in the office kitchenette, leaned over him and rubbed his earlobe for a second or two while they were reviewing a contract; and told him he "he looked good (like an actor whose name [plaintiff] could not remember)"), *aff'd*, 2022 WL 17103716 (4th Cir. Nov. 22, 2022); *Haug v. A&A GAMING, LLC*, No. CBD-15-2035, 2016 WL 6600536, at *1, *6–7 (D. Md. Nov. 8, 2016) (holding supervisor's conduct was not sufficiently severe or pervasive where he "commented on [p]laintiff's body, stating that she was slim," asked her "if she would fill in for his wife while his wife was out of town," grabbed the back of plaintiff's head and pulled it towards him and said "that if she wanted to keep her job, she better think about his offer to fill in for his wife," and asked her how many kids she had and,

45

when she told him she had two children, responded that she knew how to make children and that is what he wanted); *Moret v. Geren*, 494 F. Supp. 2d 329, 342 (D. Md. 2007) (holding supervisor's conduct was not sufficiently severe or pervasive to create hostile work environment where he "sexually propositioned [plaintiff] while discussing her salary and benefits; requested that she massage his nude buttocks; asked if she had strong fingers; forced her to speak on the phone with his son; suggested that she date his son; and, routinely leered at her, made comments about her appearance, and made comments about her make-up); *Naylor v. City of Bowie*, 78 F. Supp. 2d 469, 477 (D. Md. 1999) (holding twenty-four ongoing incidents for a period of about a year, including statements by defendant to plaintiff suggesting he "wouldn't mind" getting "into [the plaintiff's] pants" and inappropriate conduct, such as placing a condom underneath a box of candies he gave the plaintiff were not sufficiently severe or pervasive to create hostile work environment).

Dr. Washington does not distinguish these cases and only relies on *Hernandez*, a case distinguished *supra*.[13] *See* ECF 85, at 25–33. In viewing the context and quality of the incidents, even when viewing the evidence in a light most favorable to Dr. Washington, *Tolan*, 572 U.S. at 657, the Court finds no reasonable jury could find the harassment complained of constitutes "severe or pervasive" conduct. *See Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009) (noting the objective test is based on a "reasonable person" standard (citing *Harris*, 510 U.S. at 21)).

---

[13] Dr. Washington focuses on advancing points that are not relevant to the court's inquiry of whether a reasonable jury could find Dr. Washington's allegations constitute a severe or pervasive work environment as a matter of law. *See, e.g.*, ECF 85, at 28–29 (arguing that incidents that occurred between Dr. Washington and Dr. Harpe in private are permissibly considered, while the Court is already accepting all of Dr. Washington's allegations as true for purposes of this motion); *id.* at 30–31 (contesting whether Dr. Washington reported the harassment to Mr. Rudasill and Ms. Billie, which is irrelevant when the Court is assuming all the incidents Dr. Washington alleges did occur for purposes of the motion for summary judgment); *id.* at 32 (arguing Dr. Washington's statement that 10-20 private meetings occurred over seven months is more reliable than Dr. Harpe's statement that there were one to two private meetings, which is irrelevant when the Court is construing all facts in a light most favorable to Dr. Washington).

Dr. Washington has not successfully alleged that these comments were severe or pervasive enough to deprive Dr. Washington of her constitutional right to equal protection under the law. Dr. Washington's claims are not of the same class of those that courts in this circuit have held cleared the "high bar" of "severe or pervasive" conduct. *See supra.* Much like in *Hartsell*, the claims Dr. Washington propounds are "so far from the paradigmatic case of sexual harassment, that summary judgment [is] clearly appropriate." *Hartsell*, 123 F.3d at 773. Because Dr. Washington has failed to adduce evidence that Dr. Harpe subjected her to harassment so objectively severe or pervasive as to alter the conditions of her employment, the Court will dismiss Count III against Dr. Harpe.

In sum, Defendants' motion to dismiss Count III against Ms. Billie and Dr. Harpe is GRANTED

## IV.    CONCLUSION

For the foregoing reasons Defendants' motion for summary judgment is **GRANTED**. A separate implementing Order will issue.

Dated: July 12, 2024                                      /s/
                                              Brendan A. Hurson
                                              United States District Judge

47